# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

FREEDOM FROM RELIGION
FOUNDATION, INC., et al.,

        Plaintiffs,

    v.                                Case No. 07-C-1151

CITY OF GREEN BAY, et al.,

        Defendants.

## DECISION AND ORDER GRANTING
## DEFENDANTS' MOTION TO DISMISS

Freedom From Religion Foundation, Inc., ("FFRF") as well as several individual citizens, filed this action on December 26, 2007, alleging that a Nativity scene displayed at Green Bay City Hall violated the Establishment Clause of the First Amendment. According to the Amended Complaint, on December 11, 2007, City Council President Chad Fradette ordered a Nativity scene placed on the roof of City Hall's entrance, where it was displayed prominently. On December 17, the City implemented a moratorium on the display of religious symbols but allowed the Nativity scene to be displayed until December 26. Three of the plaintiffs attempted to display their own religious (non-Christian) symbols, but were denied the right to do so.

The Plaintiffs contend that the Defendants actions violate their rights under the First Amendment. More particularly, they claim that the actions of the Defendants constitute government endorsement of Christianity which is prohibited by the First Amendment's Establishment Clause. The actions of Council President Fradette, plaintiffs allege, was not only intended to endorse a

religious message, but was meant to be a deliberate provocation on behalf of the City. According to the amended complaint, Council President Fradette admitted as much "by publicly challenging persons who object to the public display of religious symbols to confront religious proponents in Green Bay" (Am. Compl. ¶ 33), as opposed to the City of Peshtigo, where a similar display had been erected. The Plaintiffs seek relief in the form of a declaration that the actions of the Defendants violated the Establishment Clause of the First Amendment to the United States Constitution; an injunction enjoining the Defendants from promoting, advancing, or endorsing the establishment of religion by public displays of religious symbols that give the appearance of government sponsorship of religion; a judgment awarding nominal damages against each Defendant; and for reasonable costs, disbursements and attorneys fees. (Am. Compl. at 12-13.)

In Lynch v. Donnelly, 465 U.S. 668 (1984), the Supreme Court rejected a claim that the City of Pawtucket, Rhode Island violated the Establishment Clause of the First Amendment by erecting a Christmas display in a privately-owned park located in the heart of the City's shopping district that included a crèche, or nativity scene. Noting that the display was "sponsored by the City to celebrate the Holiday and to depict the origins of that Holiday," id. at 681, the Court concluded that the inclusion of the crèche had a secular purpose, did not impermissibly advance religion, and did not create excessive entanglement between religion and government. Id. at 685. But instead of creating a clear rule on whether a municipality may constitutionally display a crèche as a symbol of the national, state and municipal holiday that is celebrated every December 25th, the majority opinion, read in conjunction with Justice O'Connor's concurrence, created a multi-factor balancing test that eschews easy application and requires judges before whom such cases are brought to undertake a "scrutiny more commonly associated with interior decorators than with the judiciary." American

2

Jewish Congress v. City of Chicago, 827 F.2d 120, 129 (7th Cir. 1987) (Easterbrook, J., dissenting). Thus, in County of Allegheny v. American Civil Liberties Union, Greater Pittsburgh Chapter, 492 U.S. 573 (1989), a majority of the Court held that a crèche placed by a private group inside a public building violated the Establishment Clause, id. at 598-602, but that a menorah placed alongside a Christmas tree and a "sign saluting liberty" outside that same building did not. Id. at 613-21. More recently, utilizing the same balancing test, the Court by a 5 to 4 vote upheld a display of the Ten Commandments on a granite monument situated on the grounds of the Texas State Capitol, Van Orden v.Perry, 545 U.S. 677 (2005), while on the same day, again on a vote of 5 to 4, it found the display of the Ten Commandments in two Kentucky county courthouses unconstitutional. McCreary County v. American Civil Liberties Union of Kentucky, 545 U.S. 844 (2005).

The question of which side of this uncertain divide the crèche in this case falls is not presently before me. Choosing to fight that battle only if necessary, the Defendants, the City of Green Bay as well as Mayor Jim Schmitt and City Council President Chad Fradette, have moved to dismiss on the grounds of mootness and lack of standing. They also contend that the actions of Fradette were *ad hoc* rather than official City policy and thus cannot serve as a basis for municipal liability. Having considered the briefs and arguments of the parties, I now conclude for the reasons set forth below, that none of the Plaintiffs have standing because none of the relief they seek would redress the injuries they claim. I therefore grant the Defendants' motion to dismiss.

## I. Standing and Mootness

It is fundamental to the exercise of judicial power under Article III of the United States Constitution that "federal courts may not give opinions upon moot questions or abstract

3

propositions." Protestant Mem'l Med. Ctr., Inc. v. Maram, 471 F.3d 724, 729 (7th Cir.2006). Article III of the Constitution limits a federal court's jurisdiction to "cases" and "controversies." U.S. Const. Art. III, § 2, cl.1. The "case or controversy" requirement insures that the Federal Judiciary respects "the proper-and properly limited-role of the courts in a democratic society." Allen v. Wright, 468 U.S. 737, 750 (1984) (quoting Warth v. Seldin, 422 U.S. 490, 498 (1975)). The doctrine of standing is "an essential and unchanging part of the case-or-controversy requirement of Article III," Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992).

The core component of standing derived directly from the Constitution is the requirement that the party bringing the suit allege some actual or threatened injury caused by the putatively unlawful conduct of the defendant which is likely to be redressed by the requested relief. Valley Forge Christian College v. Americans United for Separation of Church and State, Inc., 454 U.S. 464, 472 (1982). In other words, to have standing to sue in federal court a "plaintiff must allege (1) that he has suffered an injury in fact (2) that is fairly traceable to the action of the defendant and (3) that will likely be redressed with a favorable decision." Books v. City of Elkhart, 235 F.3d 292, 299 (7th Cir.2000) (citing Lujan, 504 U.S. at 560-61. This requirement insures that the federal judicial power is confined to a role consistent with a system of separated powers and limited to cases which are traditionally thought to be capable of resolution through the judicial process. Flast v. Cohen, 392 U.S. 83, 97 (1968). Thus, federal courts have abjured appeals to their authority which would convert the judicial process into "no more than a vehicle for the vindication of the value interests of concerned bystanders." United States v. SCRAP, 412 U.S. 669, 687 (1973). "[T]he 'cases and controversies' language of Art. III forecloses the conversion of courts of the United States into judicial versions of college debating forums. Valley Forge Christian College, 454 U.S. at 473; see

4

also Air Line Pilots Ass'n v. UAL Corp., 897 F.2d 1394, 1396-97 (7th Cir.1990) (the test is whether the relief sought would "make a difference to the legal interests of the parties (as distinct from their psyches, which might remain deeply engaged with the merits of the litigation)").

This is not to say that the questions of law raised in cases lacking actual or threatened injury may not be important. But it is not the role of the courts in a constitutional democratic republic such as ours to decide such questions, other than as a by-product of their true job, which is to decide cases and controversies within the meaning of Article III. See The Federalist No. 78. "If a dispute is not a proper case or controversy, the courts have no business deciding it, or expounding the law in the course of doing so." DaimlerChrysler Corp. v. Cuno, 547 U.S. 332, 341 (2006).

The closely related doctrines of standing and mootness are based upon Article III's limitation of judicial power. "Standing doctrine addresses whether, at the inception of the litigation, the plaintiff had suffered a concrete injury that could be redressed by action of the court. Mootness addresses whether the plaintiff continues to have such a stake throughout the course of the litigation." Utah Animal Rights Coalition v. Salt Lake City Corp., 371 F.3d 1248, 1263 (10th Cir. 2004) (McConnell, J. concurring). The Supreme Court has described the doctrine of mootness as "the doctrine of standing set in a time frame: The requisite personal interest that must exist at the commencement of the litigation (standing) must continue throughout its existence (mootness)." Arizonans for Official English v. Arizona, 520 U.S. 43, 68 n. 22 (1997).

In this case, although the Defendants have framed their argument in terms of mootness, the question they have raised is really one of standing. More specifically, the question raised relates to the third element of standing, namely, whether the injury alleged is one "that will likely be redressed with a favorable decision." Books, 235 F.3d at 299. The Defendants argue that the City's

5

moratorium on all displays, coupled with the taking down of the offending display on December 26, hours before the suit was filed, extinguished any live controversy between the parties before the case was commenced. At its meeting on December 17, the City's Common Council rejected an advisory committee's recommendation that the City allow symbols from a variety of religions to be displayed at City Hall.[1] After hearing from dozens of citizens on both sides of the issue, the Council enacted a moratorium on all future displays. The minutes read as follows:

> Moved by Ald. Zima, seconded by Ald. Deneys, that the existing holiday display including Santa, holiday lights, and Nativity scene be displayed until December 26 and that a moratorium be put in place for all future displays until such time as a policy is approved by the Mayor and Common Council.

(Minutes at 11.) The display was in fact removed by City employees before 9:00 a.m. on December 26, 2007. (Decl. of James J. Schmitt ¶ 17.) Plaintiffs filed their original complaint that same day at 12:07 p.m. (Doc. #1.) Under these circumstances, Defendants contend that Plaintiffs' claims are moot.

### A. Claims for Declaratory and Injunctive Relief

The Plaintiffs deny that their claims for injunctive and declaratory relief are moot and portray the City's moratorium as a tenuous stop-gap solution rather than any official, long-term City policy. In fact, they call the moratorium a "litigation subterfuge" designed to moot their claims and insulate the City from liability. They note that despite the supposed moratorium, the Council and Mayor have not adopted any new formal guidelines. The Plaintiffs further question the good faith

---

[1]The minutes are available at Dkt. # 6-3 and at http://www.ci.green-bay.wi.us/mins_agd /minutes/20071218MN1661.html Both sides have submitted evidence outside of the pleadings, which is somewhat common when standing and mootness have been raised as defenses. I may take judicial notice of the minutes of the Common Council meeting, and I thus need not "convert" the motion into one for summary judgment.

6

of the Mayor, who has publicly supported the display in an open letter published in the *Green Bay Press-Gazette*.

I first note that the Mayor's personal views on public religious displays have no bearing on the mootness or standing question. It would be one thing if Mayor Schmitt were threatening to personally place another religious display on public property himself, but the mere fact that he happens generally to support Christmas displays that include a symbolic depiction of the historical event the day was originally intended to commemorate does not somehow render the Council's moratorium a sham.

Second, the fact that the Council has not adopted any new guidelines is not surprising given (1) the uncertainty of the law governing such displays; (2) the City's potential liability under the Civil Rights Attorneys Fees Act of 1976; and (3) the fact that the City has now been sued. Under the Civil Rights Attorneys Fees Act, 42 U.S.C. § 1988, defendants in actions alleging civil rights violations are required to pay the actual costs and attorneys fees of the plaintiffs if the plaintiffs prevail.[2] The possibility of being ordered to pay the plaintiff's attorneys fees, combined with the unpredictability of the Supreme Court's Establishment Clause jurisprudence, which almost guarantees prolonged litigation at substantial expense, creates a strong incentive for budget-conscious local governments to accede to demands from groups like the plaintiffs that government buildings and other property be cleansed of all signs and symbols of the country's religious heritage.

---

[2]Although the language of the Act actually states that "the court, in its discretion, may allow the prevailing party . . . a reasonable attorney's fee . . . ," 42 U.S.C. § 1988, the Court early on construed this language to mean that while a prevailing plaintiff is entitled to attorneys fees absent special circumstances, a defendant who prevails in such a lawsuit is entitled to recover his attorneys fees only if the plaintiff's action is shown to have been frivolous, unreasonable, or without foundation. Christianburg Garment Co. v. E.E.O.C., 434 U.S. 412 (1978).

Thus, for example, in 2004 Supervisors for Los Angeles County, California, voted to redesign the County's seal, which contained a small cross symbolizing the Spanish missions that played an integral role in the county's history, rather than face a lawsuit by the American Civil Liberties Union ("ACLU"). Although replacing the seal on approximately 90,000 uniforms, 12,000 vehicles, and 6,000 buildings was expected to cost around $1 million, the County's attorneys advised that refusing to do so would have required the County to undertake the costly defense of an action threatened by the ACLU and risk paying not only the cost of compliance if it lost, but the ACLU's legal fees as well.[3] See Tomlinson, Christopher D., Changing The Rules Of Establishment Clause Litigation: An Alternative To The Public Expression Of Religion Act, 61 Vand. L. Rev. 261, 262 (2008). Faced with the possibility of paying the Plaintiffs' attorneys fees in this case, the City's reluctance to adopt new guidelines, especially since it costs nothing to prohibit any display altogether, is understandable.[4]

More importantly, the absence of guidelines is immaterial because the Council's current moratorium means that no further displays will be allowed at all. The moratorium is, in effect, the City's official position on religious displays. If the Council does enact guidelines in the future,

---

[3]As it turned out, the County was still sued, but not by the ACLU. Instead, a County resident filed suit claiming that the County's removal of the cross from the seal conveyed a state-sponsored message of hostility toward Christians. Vasquez v. Los Angeles ("LA") County, 487 F.3d 1246 (9th Cir. 2007). The suit was dismissed at the pleading stage, however, so from an economic standpoint, the County's decision to modify its seal may well have been the most reasonable one.

[4]The Defendants are represented in this case by Liberty Counsel, "a nonprofit litigation, education and policy organization dedicated to advancing religious freedom, the sanctity of human life and the traditional family." http://lc.org/index.cfm?PID=14096 (last visited Oct. 2, 2008) As a result, it appears the City will not incur significant fees of its own as a result of this litigation. But there is nothing in the record to suggest that Liberty Counsel has agreed to pay Plaintiffs' legal fees in the event they prevail.

8

those guidelines can be challenged in another lawsuit. But the fact that they have taken no further action does not somehow suggest that the moratorium is not a *bona fide* one.

Nor are the Plaintiffs correct that the moratorium represents some sort of "subterfuge" – a litigation gimmick to eliminate jurisdiction on a pending case. It is true that the general rule is that the voluntary cessation of allegedly wrongful conduct after a lawsuit has been commenced does not deprive a federal court of its power to determine the legality of the challenged conduct. Friends of the Earth, Inc. v. Laidlaw Environmental Services, Inc., 528 U.S. 167, 189 (2000). Otherwise, the defendant would be free to return to the same conduct once the case was dismissed. Id. But that rule only applies where the defendant ceases the offending conduct after suit is filed. Even then, there are exceptions to the general rule. When governmental officials voluntarily express an intent to cease allegedly wrongful conduct regarding the plaintiff, for example, a rebuttable presumption exists that the expressed intent is genuine. Troiano v. Supervisor of Elections in Palm Beach County, 382 F.3d 1276, 1283 (11th Cir. 2004); Fed'n of Adver. Indus. Representatives, Inc. v. City of Chicago, 326 F.3d 924, 929-30 (7th Cir. 2003); Chicago United Indus., Ltd. v. City of Chicago, 445 F.3d 940, 947 (7th Cir. 2006) (stating that "the respect or *politesse* that one government owes another, and thus that the federal government owes state and local governments . . . requires us to give some credence to the solemn undertakings of local officials," and noting separate case where "the presumption was rebutted"); Magnusson v. City of Hickory Hills, 933 F.2d 562, 565 (7th Cir. 1991) ("When the defendants are public officials . . . we place greater stock in their acts of self-correction, so long as they appear genuine."). If the plaintiff's only claims seek to require governmental officials to cease allegedly wrongful conduct, and those officials offer to cease that conduct, then the claims should be dismissed as moot, absent some evidence that the offer is

disingenuous.  Fed'n of Adver. Indus. Representatives, 326 F.3d at 930; Chicago United Indus., 445 F.3d at 947.  Only in cases where there is evidence creating a reasonable expectation that the governmental officials' expressed intent is not genuine has the Supreme Court refused to hold the case moot.  E.g., City of Mesquite v. Aladdin's Castle, Inc., 455 U.S. 283, 289 & n.11 (1982) (presumption rebutted by city's stated intention to reenact the enjoined ordinance); Northeastern Fla. Chapter of the Assoc'd Gen. Contractors of Amer. v. City of Jacksonville, 508 U.S. 656, 662 (1993) (case not moot where city had already enacted ordinance substantially similar to the challenged, repealed ordinance).

In arguing that the case should nevertheless continue, Plaintiffs cite Pleasureland Museum, Inc. v. Beutter, which applied the general rule that a defendant's voluntary cessation of offending conduct will not typically moot a case.  288 F.3d 988, 999 (7th Cir. 2002).  There, the court was addressing a city ordinance requiring adult businesses and their employees to submit detailed personal and financial information.  Following the issuance of the Seventh Circuit's opinion in Schultz v. Cumberland, 228 F.3d 831, 849 (7th Cir. 2000), the defendant's city council issued a moratorium ceasing enforcement of these provisions until the "matter is resolved."  Id.  This moratorium, the defendants argued, mooted the plaintiff's constitutional claim.

The Seventh Circuit disagreed.  Relying on City of Los Angeles v. Lyons, 461 U.S. 95, 97-98 (1983), the court found that the moratorium was essentially a temporary one in force pending the outcome of the litigation: "Mishawaka has stated that it will 'suspend enforcement' of the provisions only until the 'matter is resolved.' As in Lyons, the Mishawaka moratorium is not permanent and could be lifted at any time." *Id.*

The result in Pleasureland Museum was not surprising. The town's "moratorium" in that case merely stated that it would "suspend enforcement of" existing regulations pending further review. A suspension of *enforcement* of existing regulations for an indeterminate time period is hardly a permanent resolution of the matter. See also Milwaukee Police Ass'n v. Jones, 192 F.3d 742, 746 (7th Cir. 1999) (case not moot where department memorandum provided that offending directives "shall be temporarily disregarded," "immediately and until further notice.") Similarly, in *Lyons,* the City of Los Angeles issued a six-month moratorium on police chokeholds (a longstanding police practice), and the moratorium was later extended pending further "opportunity to review and evaluate" reports regarding alternative police techniques. 461 U.S. 100 n.4. In neither case did the supposed moratorium have any suggestion of a permanent change in city policy.

Two things stand out about Green Bay's moratorium. First, it was enacted in response to an *ad hoc* situation that arose after Fradette ordered the religious display. In contrast, the moratoriums imposed in Lyons and Pleasureland Museum were both responses to longstanding official policies and practices (an actual ordinance in the latter case), and so both cities' responses effectively operated merely to suspend the status quo. They were not, in other words, actual policy changes, and when they expired things would return to the pre-moratorium conditions that offended the plaintiffs in those cases. Here, the moratorium *is* a policy change: it forecloses all religious displays and indicates that none will be allowed until a policy is implemented. The requirement that a policy be in place is *itself* a change in policy, a statement that the City would no longer allow individuals to place religious displays at City Hall at their sole discretion or whim. Thus, Green Bay's moratorium effectuated a policy change – rather than a mere suspension of the status quo –

11

and that suggests Green Bay's moratorium had far more permanence than those at issue in <u>Lyons</u> or <u>Pleasureland Museum</u>.

Second, from the above discussion it follows that Green Bay's moratorium means the status quo will never occur again. In both <u>Lyons</u> and <u>Pleasureland Museum</u> the moratoriums suspended a specific pre-existing challenged practice or ordinance, meaning that absent the moratorium (upon their expiration) the offensive practice would begin anew. The status quo would be reinstated. Green Bay's moratorium is far different. Its expiration would not restart some existing practice of allowing Christian-only symbols, because such a practice or policy does not exist. Instead, the moratorium only expires in the event the City Council takes further action to develop an actual ordinance or policy on such matters. That is, the moratorium does not merely suspend an existing practice, it signals an entirely new way of going about things. It is, in effect, a permanent change to city policy.

This distinction is an important one because in the mootness analysis the question is whether there is a reasonable expectation that the injury will be repeated. <u>DiGiore v. Ryan</u>, 172 F.3d 454, 466 (7th Cir. 1999), <u>overruled on other grounds by Whetsel v. Network Property Services</u>, <em>LLC</em>, 246 F.3d 897 (2001). In considering that question, it is important to define exactly what the injury is. In <u>Lyons</u>, it was an existing practice involving police chokeholds, and in <u>Pleasureland Museum</u> it was a city ordinance; in either case, it was reasonable to expect not only that the moratorium would be lifted, but that when it was lifted the *same* offending practices would be repeated. <u>See also</u> <u>Jones</u>, 192 F.3d at 746 (noting that "memorandum explicitly provided that the former practice might resume in the future, declaring that the change was only temporary and 'until further notice.'") As such, in those cases it would make little practical sense to dismiss the cases on mootness grounds

12

and require the plaintiffs to file new lawsuits when the very same injury arose in the future. Here, the alleged harm resulted from the isolated and unauthorized act of the City Council President, who decided that a Nativity scene should be placed on the roof of City Hall. Unlike <u>Lyons</u> and <u>Pleasureland Museum</u>, it should be evident that never again will such a haphazard scenario cause injury to the Plaintiffs because the moratorium explicitly requires that a policy be in place before religious symbols are displayed. <u>DiGiore</u>, 172 F.3d at 466 (noting that "the unusual circumstances" of the plaintiff's injury suggested the injury would not be repeated).

To explain this point further, it might be helpful to consider the three possible scenarios that may ensue. First, the Council could fail to enact a new policy and the moratorium banning all religious displays could remain in effect permanently. Second, the Council could lift the moratorium and enact a broad policy that meets with the Plaintiffs' satisfaction. Third, the Council could enact a policy that offends the Plaintiffs, say, by favoring one religion over others.

Obviously, in the first two scenarios the Plaintiffs suffer no future injury at all: either all religious displays are banned or the policy meets with their satisfaction. As for the third case, any offense the Plaintiffs experienced would be a new injury caused pursuant to a *new* policy that is not even in existence yet. In the event the Council and Mayor do act to craft a policy that allows the display of symbols that offend the Plaintiffs, that policy – not anything related to the unique events of December 2007 – will be the source of any new injury. Thus, in <u>Lyons</u> and <u>Pleasureland Museum</u> it would have been wasteful to dismiss on mootness grounds when the plaintiffs were likely to suffer the identical injury in the future. Here, however, such a concern is absent where the nature of any future injury (if any) would be dependent on an entirely novel city policy that is not presently before the Court. In short, if the Plaintiffs are injured in the future, it will be a *new* injury, not a reprise of the injury alleged in this case.

Finally, and more fundamentally, <u>Pleasureland Museum</u> and <u>Lyons</u> are also distinguishable because they both involved defendants who changed their behavior only after litigation began. In <u>Pleasureland Museum</u>, the City of Mishawaka suspended enforcement of its ordinance – apparently in light of a 2000 Seventh Circuit decision – only after it was sued by the plaintiffs. The same is true in <u>Lyons</u>. Thus, the issue raised there was whether the plaintiffs' claims had become moot as a result of changed circumstances. Courts sometimes look askance at such behavior under the theory that "a party should not be able to evade judicial review, or to defeat a judgment, by temporarily altering questionable behavior." <u>City News & Novelty, Inc. v. City of Waukesha</u>, 531 U.S. 278, 284 n. 1 (2001). The fact that these moratoriums were responses to litigation and had indefinite timeframes meant that neither one had any indicia of permanence. <u>See also Jones</u>, 192 F.3d at 746 (noting that temporary suspension of directives was merely done to comply with court order).

Here, again by contrast, the Council's moratorium was enacted on December 18, some eight days prior to the complaint being filed, and the entire display was removed before 9:00 a.m. on December 26, more than three hours before the lawsuit was filed. The issue raised is thus not whether the Plaintiffs' claims for declaratory and injunctive relief are now moot, but whether they ever had standing to assert such claims in the first place. Clearly, they did not. Once the display was removed, there was no need for the Court to order its removal, and since the City has no policy in place under which it could be resurrected, there is nothing for the Court to declare invalid. Accordingly, I conclude that Plaintiffs' claims for declaratory and injunctive relief must be dismissed.

14

**B. The Claim for Nominal Damages**

There remains the question of whether Plaintiffs' claim for nominal damages, which was added in their Amended Complaint filed several months after the display was removed, is sufficient to keep the case alive. Even if the claims for injunctive relief are found moot, Plaintiffs note that three of their number are also seeking nominal damages based on the injury that has already occurred – the two-week period last December when they had to endure the Nativity scene's presence at City Hall.[5] In their view, the existence of a nominal damages claim means their lawsuit should survive because a judgment in their favor would entitle them to a judgment of one dollar in nominal damages. The Defendants, on the other hand, argue that the entire case is moot and maintain that the fact that the Plaintiffs seek merely symbolic relief cannot suffice to establish a live controversy. Surprisingly, the question of whether a claim for only nominal damages presents a live controversy is not completely settled.[6]

---

[5]The Seventh Circuit has held that "a plaintiff may allege an injury in fact when he is forced to view a religious object that he wishes to avoid but is unable to avoid because of his right or duty to attend the government-owned place where the object is located." Books, 235 F.3d at 301. Although this liberal definition of injury in fact has been called into question, see Books v. Elkhart County, 401 F.3d 857, 870-71 (7th Cir. 2005) (Easterbrook, J., dissenting), it remains the law in this Circuit, and Defendants concede that at least one of the Plaintiffs, Taku Ronsman, can satisfy this first element of standing. (Reply Br. at 12-13.) Thus, if the crèche were still in place, at least Ronsman would have standing to seek redress for such injury in the form of an injunction directing the local government to remove the object. The question here, however, is whether now that the City has removed the offending display any form of relief presently available would provide redress for the injury alleged.

[6]Defendants' concede in their reply brief that the Seventh Circuit has held that a claim for only nominal damages is sufficient to support federal jurisdiction and assert that they raise the issue here merely to preserve it for appeal. (Reply Br. at 7.) Because the parties cannot confer jurisdiction that does not otherwise exist, however, I must make my own determination. See Weaver v. Hollywood Casino-Aurora, Inc., 255 F.3d 379, 381 (7th Cir.2001) (noting that parties cannot waive subject matter jurisdiction, and district courts have a duty to determine that subject matter jurisdiction exists).

15

Looking at the issue afresh, it seems unlikely that a claim of nominal damages by itself would support Article III jurisdiction. The courts have long held that "nominal damages, of which $1 is the norm, are an appropriate means of vindicating rights whose deprivation has not caused actual, provable injury." Kyle v. Patterson, 196 F.3d 695, 697 (7th Cir. 1999). But as noted above, federal courts lack jurisdiction to decide cases where there is no actual or threatened injury alleged because their constitutional authority extends only to actual cases or controversies. Valley Forge, 454 U.S. at 472. And to satisfy the Article III case or controversy requirement, "a litigant must have suffered some actual injury that can be redressed by a favorable judicial decision." Iron Arrow Honor Soc'y v. Heckler, 464 U.S. 67, 70 (1983). By seeking only nominal damages, Plaintiffs have conceded at the outset that they suffered no actual injury, or at least that the injury they claim cannot be redressed by an award of actual damages. Thus, it would appear they have no standing.

Judge McConnell, a noted First Amendment expert, offered persuasive support for this conclusion his concurring opinion in Utah Animal Rights Coalition, supra, 371 F.3d at 1262. Bound by circuit precedent, Judge McConnell found the case presented a live controversy, but he wrote separately to encourage the 10th Circuit to reconsider its precedent. In his concurring opinion, Judge McConnell noted that nominal damages are symbolic only, do not compensate for past wrongs, and were traditionally appropriate "when an authoritative legal determination of a dispute is all that the parties require: neither damages nor injunctive relief are necessary." Id. at 1264. Further, nominal damages are the functional equivalent of declaratory relief: "Nominal damage awards serve essentially the same function as declaratory judgments; indeed, scholars tell us that nominal damages were originally sought as a means of obtaining declaratory relief before passage of declaratory judgment statutes." Id. at 1265; see also 13A Wright, Miller & Cooper,

16

Federal Practice and Procedure: Jurisdiction 2d § 3533.3, at 266 (2d ed. 1984) ("The very determination that nominal damages are an appropriate remedy for a particular wrong implies a ruling that the wrong is worthy of vindication by an essentially declaratory judgment"). Thus, for justiciability purposes, there is no reason to treat nominal and declaratory relief differently. Id. at 1265. Each is a different form of remedy available in cases where the court has Article III jurisdiction. But neither were intended to confer jurisdiction that did not otherwise exist. To conclude otherwise, Judge McConnell concluded, would unreasonably expand federal court jurisdiction:

> Indeed, if appending a claim for nominal damages were sufficient to create standing or to avoid mootness, litigants could manufacture Article III jurisdiction by the mere expedient of pleading. It is hard to conceive of a case in which a plaintiff would be unable to append a claim for nominal damages, and thus insulate the case from the possibility of mootness. Article III justiciability should not be so manipulable.

Id. at 1266.

The question raised here, of course, is not whether there are cases in which an award of nominal damages is appropriate. Clearly, there are. If, for example, the crèche was still on display and determined to be an unconstitutional establishment of religion, an award of nominal damages would be appropriate, since it would represent an authoritative legal determination of an ongoing dispute. Although the passage of the Declaratory Judgment Act, 28 U.S.C. § 2201, created a more direct way of obtaining such relief, nominal damages remain available for that purpose. More often, however, nominal damages are awarded at the end of a case when a plaintiff prevails on liability, but no compensatory damages are found. See, e.g., Farrar v. Hobby, 506 U.S. 103 (1992) (plaintiff awarded $1 upon jury's finding of no compensable injury resulted from civil rights violation). The question of standing does not arise in such cases because the plaintiff's claim for compensatory

17

damages means there is a live dispute in need of judicial resolution throughout. But here, from the very beginning plaintiffs have asserted no claim that they suffered any compensable injury, nor could they.

As Judge McConnell also pointed out, "[t]he Supreme Court has never held that a claim for nominal damages is sufficient to maintain the justiciability of a case that otherwise would be moot." Utah Animal Rights Coalition, 371 F.3d at 1266. The Court's two leading cases on nominal damages are Carey v. Piphus, 435 U.S. 247 (1978), and Memphis Community School Dist. v. Stachura, 477 U.S. 299 (1986). The issue of mootness, or standing, arose in neither case "because in both cases, the plaintiffs' entitlement to compensatory damages was a live issue at each stage of the litigation." Utah Animal Rights Coalition, 371 F.3d at 1266. In Arizonans for Official English the Court reversed a lower court ruling that the case was not moot on account of a claim for nominal damages against the State of Arizona. 520 U.S. at 69-72. But it did so on the ground that the State cannot be liable for damages under 42 U.S.C. § 1983, see Will v. Michigan Dept. of State Police, 491 U.S. 58, 71 (1989), and thus found no need to address the "the nominal damages solution to mootness." 520 U.S. at 69 n. 24.

More recently, the Sixth Circuit held that a case was moot when the only relief sought by the plaintiff was an award of nominal damages. In Morrison v. Board of Education of Boyd County, 521 F.3d 602 (6th Cir. 2008), a group of parents and high school students challenged the school district's harassment policy and training policy which they claimed created a speech code that prevented students from voicing their convictions that homosexual behavior is sinful and undermined their ability to practice their Christian faith. While the case was pending, the school board revised the policy to clarify that "[t]he civil exchange of opinions or debate does not

18

constitute harassment," and that what was prohibited was "behavior that interferes with the rights of another student or materially and substantially disrupts the educational process." Id. at 607. With this change, the district court dismissed the case, including plaintiffs' claims for nominal damages for the school year during which the policy remained in effect and "chilled" their speech. Id. The Sixth Circuit affirmed. Although the Court concluded that the remaining plaintiff's claim that his speech was chilled by the previous policy failed to state an injury-in-fact, it went on to hold that the plaintiff had failed to establish the second element of standing – namely, that nominal damages would redress the alleged injury. Noting that the plaintiff was seeking nominal damages "based on a regime no longer in existence," id. at 611, and citing Judge McConnell's concurring opinion in Utah Animal Rights, the Court held that an award of nominal damages would have no effect on the parties' legal rights and, thus, plaintiff's suit failed to satisfy the second requirement for standing. Id. The Court concluded:

> This case should be over. Allowing it to proceed to determine the constitutionality of an abandoned policy-in the hope of awarding the plaintiff a single dollar-vindicates no interest and trivializes the important business of the federal courts.

Id.

This case presents an even stronger case for dismissal than either Morrison or Utah Animal Rights, since the allegedly unconstitutional action had ceased and the policy was changed before the lawsuit was even filed. Plaintiffs point out, however, that this Court is bound not by the Sixth, but by the Seventh Circuit. And in this Circuit, Plaintiffs argue, the question of whether a bare claim for nominal damages can support Article III jurisdiction, either for mootness or standing purposes, is not an open one. Citing Brandt v. Board of Educ. of City of Chicago, 480 F.3d 460 (7th

19

Cir. 2007), Plaintiffs note that the Seventh Circuit has found that nominal damages can be an important component of a civil judgment. In that case, however, the court actually belittled the plaintiffs' assertion that being forced to miss gym class for nine days constituted a constitutional violation of sufficient gravity. Id. at 465 ("Even multiplied by 24 (the number of members of the plaintiff class), the damages sustained by an eighth grader as a consequence of missing phys ed and labs on nine days out of an entire school year are minuscule to the point of nonexistent; and *de minimis non curat lex* (the law doesn't concern itself with trifles) is a doctrine applicable to constitutional as to other cases."). The Brandt Court also observed that even an award of only nominal damages "presupposes a violation of sufficient gravity to merit a judgment," Id. Although the Court ultimately concluded that the plaintiffs' claim failed on its merits, its analysis hardly supports Plaintiffs' contention that this case should continue.

Plaintiffs also cite Calhoun v. DeTella, 319 F.3d 936 (7th Cir. 2003), but again that case does not address the precise issue raised here. It is true that Calhoun stands for the principle that a prisoner plaintiff may bring a claim for only nominal damages. But Calhoun is a case about the Prision Litigation Reform Act (PLRA), 42 U.S.C.A. §§ 1997e(e), rather than Article III: the court there merely concluded that the PLRA's bar on recovery for non-physical damages did not also serve as a bar to jurisdiction. Notably, Calhoun did allege psychological injury, and the court was thus grappling with the PLRA's ban on recovery for that type of injury. Its conclusion was that even though Calhoun could not recover for his psychological injury, he could still get nominal damages. But that is different from saying that he could have proceeded with the case had he not alleged the psychological injury in the first place. The Calhoun court recognized this distinction itself, noting that "physical injury is merely a predicate for an award of damages for mental or emotional injury,

20

not a filing prerequisite for the federal civil action itself." Id. at 940. The PLRA governs recovery, not jurisdiction or mootness. Thus, the court sensibly concluded that a prisoner plaintiff could allege only emotional injury (for which he could not recover under the PLRA) and still proceed with his case even though the PLRA meant that the only relief he could obtain would be nominal. The PLRA wipes out the damages, but it does not wipe out jurisdiction. Again, the fact that nominal damages may be awarded at the end of a case does not mean that they suffice to make justiciable an entire federal lawsuit from the outset. And of course the Defendants are not calling into question the viability of nominal damage awards in general, they are merely suggesting that when a complained-of practice has ceased, and when *only* nominal damages are sought, the case or controversy has ended before the lawsuit has even begun.

Plaintiffs also cite a case from this district in which Judge Adelman noted that nominal damages are commonly awarded in Establishment Clause cases like this one. In that case, Milwaukee Deputy Sheriffs Ass'n v. Clarke, the Court had already entered summary judgment in the plaintiffs' favor, finding that the defendants had promoted an evangelical Christian message in official meetings with sheriff's deputies. No 06-C-602, 2008 WL 337335, * 1 (E.D. Wis. 2008). In the decision plaintiffs cite, Judge Adelman was addressing the plaintiffs' *post*-summary judgment claims for attorney's fees, and he noted that "[a]fter deciding the summary judgment motions, I did not enter judgment because plaintiffs had not made clear whether they would attempt to prove compensable injury." *Id.* The fact that the Court awarded nominal damages and attorney's fees after it had determined that a violation occurred and the plaintiffs then abandoned their claim for compensatory damages does not somehow support the plaintiffs' argument that their claim is justiciable here where nominal damages were the only monetary relief sought from the beginning.

Case 1:07-cv-01151-WCG   Filed 10/07/08   Page 21 of 23   Document 37

And, of course, the possibility of attorneys fees does not affect whether the underlying claim is justiciable.[7] Lewis v. Cont'l Bank Corp., 494 U.S. 472, 480 (1990).

Based on the foregoing, I conclude that neither the Supreme Court, nor the Seventh Circuit has spoken decisively on the issue. I further conclude that Plaintiffs' claim for nominal damages is not sufficient to keep this case alive. The City had clearly and unequivocally changed its religious display policy (from having no policy at all to either having a formal policy or banning displays outright) before Plaintiffs' suit was even filed. Because an award of nominal damages is virtually indistinguishable from a declaratory judgment which, like Plaintiffs' claim for injunctive relief, I have already found nonjusticiable, I conclude that the Plaintiffs' nominal damages request does not prevent dismissal. Alternatively, I conclude that, even taking them at face-value, the injuries alleged by the Plaintiffs are so fleeting and slight that they do not warrant pursuing in federal court. The fact that the offending display remained in place for two weeks, assuming it is a violation, is not a "violation of sufficient gravity to merit a judgment." Brandt, 480 F.3d at 465.

It is argued that Establishment Clause cases, by their very nature, do not cause compensable injury. Thus, in a case like this where the defendants cease their offending conduct, an offended

_____

[7]The possibility of recovering an award of attorneys fees, however, can be one of the chief reasons why a plaintiff would continue to pursue litigation, despite the cost, when a favorable judgment would have no practical effect. Utah Animal Rights Coalition, 371 F.3d at 1269 (McConnell, J., concurring). The risk of having to pay such fees can also be a major obstacle to a municipality with a tight budget settling a claim against it that has no monetary value of its own and the only demand is for $1. As noted above, the prospect of recovering actual attorneys fees gives plaintiffs a substantial amount of leverage in Establishment Clause cases. See Tomlinson, supra. And while the Supreme Court held in Farrar v. Hobby that the only reasonable fee for a plaintiff who recovers only nominal damages is "usually no fee at all," 506 U.S. at 115, the multi-factor balancing test derived from Justice O'Connor's concurring opinion in that case has, on this issue also, created uncertainty that can make defendants reluctant to simply pay the nominal amount demanded and risk being ordered to pay fees, if they believe they might have a good faith defense to the action.

22

plaintiff might be left without a live controversy and he will be deprived of his day in court. But that argument ignores two important considerations. First, the Constitution is not merely a mechanism for enforcing individual rights – it is a document that governs the behavior of government actors. If government actors conform their conduct to the Constitution, the offended plaintiff need not have a day in court to ensure that the right he seeks to enforce has teeth. Second, the argument ignores the fact that in this case *the plaintiffs have already won*. The Defendants have changed their offending behavior. Practically speaking, the Plaintiffs have won a concrete victory that actually changes the circumstances on the ground. Having obtained a real-life victory, there is nothing to be gained from spending years and thousands of dollars to obtain a piece of paper saying that the Plaintiffs were right. The case is therefore dismissed. The Clerk is directed to enter judgment accordingly.

   **SO ORDERED** this __7th__ day of October, 2008.


           s/ William C. Griesbach
           William C. Griesbach
           United States District Judge